**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **RAKESH PERWANI, 1206316,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-CV-1895-K** |
| | ) | |
| **RICK THALER, Director, Texas** | ) | |
| **Dept. Of Criminal Justice, Correctional** | ) | |
| **Institutions Division,** | ) | |
| **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(b) and a standing order of reference from the district court.  The Findings, Conclusions

and Recommendation of the Magistrate Judge are as follows:

**I.  Procedural Background**

Petitioner challenges his conviction for sexual assault.  *State of Texas v. Rakesh Perwani*,

No. F-0371770-RQ (104th Crim. Dist. Ct., Dallas County, Tex., Nov. 21, 2003).  He was

sentenced to fifteen years imprisonment.  On March 11, 2005, his conviction was affirmed on

direct appeal.  *Perwani v. State*, No. 05-04-00028-CR (Tex. App. – Dallas, Mar. 11, 2005, pet.

ref'd.).  On September 14, 2005, the Court of Criminal appeals refused the petition for

discretionary review.

On December 8, 2006, Petitioner filed a state application for writ of habeas corpus.  *Ex*

*parte Perwani*, No. 68,647-01.  On December 4, 2007, Petitioner filed an amended state habeas

petition.  On September 30, 2009, the Court of Criminal Appeals denied the petition without

written order on the findings of the trial court after a hearing.

On October 2, 2009, Petitioner filed this federal petition for writ of habeas corpus.  On October 1, 2010, and October 4, 2010, Petitioner filed amended petitions.  Petitioner is represented by counsel.  He argues:

1.      He was denied the effective assistance of trial counsel when:

    (a)      counsel failed to immediately request a limiting instruction upon admission of an extraneous offense;

    (b)      counsel failed to object that the prosecutor repeatedly referred to the complainant as a "victim";

    (c)      counsel referred to Petitioner as "Middle Eastern" during voir dire;

    (d)      counsel failed to investigate, retain an expert, and present toxicology evidence challenging the prosecutor's theory of the case;

    (e)      counsel's errors resulted in cumulative prejudice;

2.      He was denied the effective assistance of appellate counsel when:

    (a)      counsel failed to argue that the state did not prove the extraneous offense beyond a reasonable doubt;

    (b)      counsel failed to argue the trial court erred in overruling Petitioner's objection that the prosecutor improperly stated she did not have to prove the extraneous offense beyond a reasonable doubt;

    (c)      counsel failed to argue the trial court erred in overruling Petitioner's objection to the prosecutor's closing argument;

    (d)      counsel's errors resulted in cumulate prejudice;

3.      Petitioner's due process rights were violated when his counsel referred to

Petitioner as "Middle Eastern" during voir dire;

4.      The prosecutor relied on false and inaccurate toxicology evidence to obtain the

conviction;

5.      No rational trier of fact could have found the extraneous offense evidence was

proved beyond a reasonable doubt;

6.      Petitioner was denied the right of confrontation and cross-examination of the

complainant because the trial court did not allow counsel to cross-examine the

complainant regarding her access to certain medications.

## II.  Factual Background

The following factual background is taken from the opinion of the Fifth District Court of

Appeals.

The complainant in this case accused appellant of date rape.  She and appellant
first met over the internet.  In February 2002, appellant contacted the complainant
through her e-mail dating account with Matchmaker.com.  Appellant informed the
complainant that he was a doctor in Houston and had gone to school in Fort Worth.  The
complainant, who lived in Fort Worth, e-mail a response to appellant stating that she was
a divorced mother of two.  They continued to communicate by e-mail, and appellant
requested the complainant's phone number.  He told her his name was Rick.  They would
occasionally chat via instant messaging through May of that year.  At some point,
appellant e-mailed the complainant a photograph that he claimed depicted him.  After
May, the complainant stopped hearing from appellant.

On July 4, 2002, appellant called the complainant in the morning.  He told her
that he had gotten a medical residency at a hospital in Dallas and wanted to take her out
that evening.  He stated that a doctor friend of his was having a pool party and they could
go there or go out for drinks.  The complainant initially said no.  She was having
relationship problems with another man and did not feel up to a date.  Later that day,
however, she changed her mind and called appellant.

Appellant told the complainant to bring clothes for the pool party, other clothes in
case they went out for drinks, the dress she was wearing in her photograph posted on
Matchmaker.com, and some alcohol.  He gave her directions to his apartment, and they
arranged to meet at seven o'clock.  The complainant ate dinner before she left Fort Worth

for the date.  On the way, she picked up a six-pack of Smirnoff Ice, an alcoholic beverage in twelve-ounce bottles.

When the complainant got to appellant's apartment, she realized he was not the man depicted in the e-mailed photograph.  She nevertheless decided to stay, and sat down with appellant on his couch.  They stayed at his apartment for approximately one hour.  While they were there, she drank two of the Smirnoff Ice beverages, and appellant drank four.  He repeatedly suggested that she put on the dress she had worn for her Matchmaker.com photograph.  She eventually agreed and wore the dress for a few minutes.  According to the complainant, at one point, appellant received a call on his cell phone and told the person on the line that they were not "going to come."  He then told the complainant they were not going to the pool party.  He said he wanted to go the bars in the Lower Greenville area of Dallas.  The complainant agreed to go but informed appellant that he was "not gonna get laid."  Appellant scoffed and said, "I can get laid anytime I want."  The complainant gave appellant her driver's license so she would not have to take a purse, and the two left for Lower Greenville.  The complainant estimated they got to Lower Greenville at approximately 8:15 p.m., but she had not worn a watch that evening.

Appellant and the complainant arrived at Zubar.  The complainant first ordered a Cape Cod, a drink consisting of vodka and cranberry juice.  Then she had another.  Between the two Cape Cods, she and appellant had "kamikaze" shots, a drink she had never tried before.  After the second Cape Cod, the complainant went to the restroom.  When she returned, there was a drink waiting for her that she had not requested.  The complainant recalled appellant saying that the drink was an almond martini.  He said he thought she would like it.  The complainant only drank about half the martini because it was "very bitter."  Approximately fifteen minutes later, the complainant began to feel sick.  She excused herself to the restroom.  On the way, she noticed she was having difficulty walking.  After she sat down to use the restroom, she could hardly get back up.

The complainant returned to appellant and told him she needed to leave.  She was very nauseous and unstable on her feet.  Appellant helped her get into his car.  On the way back to his apartment, he had to stop the car so the complainant could vomit on the side of the street.  The complainant did not remember the drive back to appellant's apartment or arriving there.  She remembered only that once they were inside, she had to stumble into the bathroom in the master bedroom to vomit again.  She vomited in violent heaves that she had never before experienced.  Afterward, she lay down on the floor by the toilet.  She felt like she could not move.  Her limbs were very heavy, and she was disoriented.

At some point, appellant came into the bathroom and told the complainant to get up.  She told him she could not move, and he repeated his command to get up.  Appellant then lifted the complainant under her arms and dragged her to his bed.  The complainant remembered lying on the bed.  The next thing she remembered was waking up with

appellant on top of her.  She was not wearing underwear.  He was not wearing any pants, and he was putting his penis in her vagina.  The complainant tried to resist appellant but could not do anything because she was pinned by appellant and her arms and legs were still feeling heavy.  She told appellant to stop, but she could not recall how loudly she was able to say it.  She heard the necklace she was wearing break while appellant was sexually assaulting her.

After appellant ejaculated, he got up to go the bathroom.  The complainant then rolled off the bed and crawled to find her underwear on the floor and put it back on.  Appellant approached her and asked what she was doing.  The complainant accused him of raping her.  Appellant denied it.  He was still not wearing pants.  He asked the complainant where she was going.  She stumbled from the bedroom to the couch to retrieve her bag and purse.  She then left the apartment.  In the parking lot, she stumbled, scattering the contents of her purse.  She was hysterical at this point.  As she picked up her things, appellant came up and threw her driver's license at her.  She got into her car.  The appellant started banging on her window, telling her they needed "to talk."

The complainant was still hysterical and crying.  She started her car and attempted to leave the apartment complex.  She got lost trying to find her way home.  She did not go to a hospital that was very near appellant's apartment because she was scared and thought the hospital, which was the one that employed appellant, would protect him.  She called her former boyfriend several time on his home telephone and cell phone, but she could not reach him.  Then, at approximately 1:30 or 2:00 a.m., she called her ex-husband.  She told him she had been raped and was lost in Dallas.  He told her to call the police.  The complainant did not do so because she was hysterical and did not know where she was.  In addition, she did not think anyone would believe her because she had been drinking.  She was still disoriented and confused, and she was "sure" she was not driving well.  It took her at least two hours just to find the interstate.  Phone records confirmed the complainant's calls to her former boyfriend and ex-husband in the early hours of July 5.  The complainant's ex-husband also testified that she had called to tell him she had been sexually assaulted.  He stated that, at the time, the complainant was "very distressed" and crying to the point that she was difficult to understand.

When the complainant got home, she passed out in her foyer and did not wake up until her ex-husband called in the morning to see if she was okay.  She saved her underwear in a Ziplock bag because she had noticed on the ride home that semen was running down her legs.  Later that day, the complainant called several friends.  Afterward, she called the Rape Crisis Center in Fort Worth but no one was available to speak with her at the time.  She e-mailed appellant to ask him why he had sexually assaulted her, but he did not respond.

That weekend, she went to Bryan, Texas with her children to see a friend.  She talked to her friend about the sexual assault.  At trial, the friend confirmed that the complainant had told her about the sexual assault.  When the complainant returned to

Fort Worth, she dropped off her children at their father's house and went with another friend to appellant's apartment complex so she could record his license plate number. At that point, she still knew appellant only as "Rick."

On the following Monday, the complainant left work to see her primary care physician. He took blood and urine samples from her because she told him she felt that she had been drugged before the sexual assault. A laboratory found three metabolites of benzodiazepine in the complainant's urine. The benzodiazepine class of drugs includes Valium, Xanax, and other central-nervous-system depressants. According to the complainant, she had taken a Valium on Saturday, June 29 before the Thursday, July 4 sexual assault; she had been given the Valium by her former boyfriend because they were traveling and she could not sleep. She denied taking Valium or any other drug containing benzodiazepine from June 30 to her July 8 doctor appointment. In fact, she denied taking any drug other than Lipitor and Levothroid between July 4 and July 8, 2002. The lab technician who analyzed the complainant's urine testified that he would not expect a dose of Valium taken on June 29 to remain in the complainant's system until July 8. The technician testified that if a person took a benzodiazepine late on July 4, he would "absolutely" expect to see evidence of the benzodiazepine in the person's urine on July 8. The technician also testified that it is "very unusual" for benzodiazepine to cause nausea and vomiting.

The complainant declined to have her primary care doctor perform a vaginal exam because she wanted to see her gynecologist for that. The next day, she went to the police and saw her gynecologist. Her gynecologist diagnosed her as having the sexually transmitted disease trichomoniasis. Before the sexual assault, she had not been experiencing the symptoms of a sexually transmitted disease. The complainant testified that at the time of the sexual assault she had not been taking birth control pills. She said her former boyfriend had always used a condom, and he was the only person she had been having sex with. The complainant's primary care doctor, however, testified she told him at her office visit on July 8 that she had been taking birth control pills. Her gynecologist testified that he had prescribed birth control pills for the complainant earlier in the year, but he did not know whether she was taking them at time of the sexual assault.

At the police station, the complainant gave a detective the underwear she had saved in a Ziplock bag. Over time, the police set up the complainant to try to record a telephone conversation will appellant, but appellant would never answer when the complainant called. On police instructions, she left him a message falsely claiming she was pregnant and needed to talk to him, but he did not return the call.

The complainant's underwear tested positive for the presence of seminal fluid. DNA testing revealed matches with the complainant's DNA and with the DNA of appellant. The probability of finding another person with the same DNA profile as appellant in the Caucasian population was one in 395 quadrillion. The probability of

finding another person with the same DNA profile as appellant in the East Indian population (the population of appellant's ethnicity) was one in 160 quadrillion.

Another witness named Ashley also testified about an encounter with appellant. She, too, became acquainted with appellant through an internet dating service. At the time, she was only nineteen years old and living in Plano, Texas. She was not acquainted with the complainant. She corresponded with appellant – who identified himself as an Italian doctor named Rick – four or five times over a two-week period starting January of 2003, at first by e-mail and then by phone. Appellant sent her the same photo he sent the complainant, claiming he was depicted in it; she, too, stated that he was not actually pictured in the photograph. Eventually, appellant and Ashley agreed to meet the Saturday of Super Bowl weekend.

Before Ashley got to appellant's apartment for their date, she met her father for dinner and had some bread sticks. She did not drink any alcohol. She got to appellant's apartment at approximately eleven o'clock p.m. She stayed at the apartment long enough to drink less than a glass and a half of wine. They left for the Lower Greenville bars after midnight. Appellant told her he knew people at the bars so she would be able to get alcohol despite her age. At the first bar, appellant ordered Ashley a "walnut or hazelnut" martini. She agreed to try it, but she did not like the drink and returned it to appellant. She ordered a chocolate martini and drank it while she talked with appellant. A man at the bar bought a round of drinks for appellant and her, so she had at least part of a beer before they left for Zubar.

When they got to Zubar, Ashley went to the restroom before meeting appellant at the bar. Without Ashley asking, appellant ordered her a lemon-flavored drink in her absence. She was still drinking the lemon-flavored drink at the bar's two a.m. closing time. She put down the drink, which was three-fourths' gone. Appellant urged her to finish it because he had "just bought it." She remarked to someone overhearing the conversation that appellant was a "tightwad" because he was making her finish the drink. She did not finish the drink, and they left for his apartment.

When they got to appellant's apartment, Ashley felt very sick and asked where the bathroom was. As soon as she got to the bathroom, she began to vomit. The sickness felt noticeably different from any nausea she had ever felt from alcohol in the past. When appellant walked into the bathroom, she asked him to call her roommate to pick her up because she knew she could not drive home. Appellant argued with her, saying that he would take care of her. She refused and insisted that appellant call her roommate. She got very upset with appellant but could not move from the toilet because she was "violently ill." Appellant told her to be quiet because he did not want to wake the neighbors. She remembered arguing with appellant with her head on the toilet. The next thing she remembered was cold water running on her in appellant's shower. She was lying on the bathtub bottom, still dressed.

As she awoke, she told appellant to turn the water off because it was very cold. Appellant got mad and stormed out of the bathroom. She crawled out of the bathroom in her wet clothing to try to find her cell phone. The apartment was dark. She was disoriented and shaking from cold. She could not walk. When she got to her purse, she found that her cell phone's battery had died. She then crawled into a bedroom, pulled a blanket off a bed, wrapped up in the blanket, and fell asleep on the floor at the foot of a bed. She could not recall for certain whether she had removed her clothing before wrapping up in the blanket.

Ashley awoke to the sound of a phone ringing. When she came to, she realized she was naked in a bed with appellant. He handed her the phone, because her roommate was calling to check on her. It was one o'clock in the afternoon. Her pelvic area and legs were sore. From the way her body felt and from the smell she knew appellant had sexually assaulted her. Appellant asked her if she remembered much of the previous night. She told him she remembered everything because she wanted him to believe she knew everything that happened to her. She gathered her wet clothing from where it was draped over the bathtub. She had not put the clothing there. She put on her wet pants and borrowed a shirt from appellant. She left, indicating to appellant that would talk again because she just wanted to get out of his apartment as soon as possible.

That same day, she went to a clinic in Plano to be examined. Personnel there said that because the incident had occurred in Dallas County, she needed to go to Parkland Hospital. She went to Parkland Hospital in the late afternoon and stayed in the waiting room for four hours. She gave a statement to a police officer and then left. She returned to Parkland Hospital the next day. She gave a police detective the clothing she had worn at appellant's apartment. She submitted to a pelvic exam and gave urine, blood, and hair samples.

The urine tests administered to Ashley did not show the presence of any drug. The toxicologist who analyzed Ashley's urine testified, however, there were certain drugs, when combined with alcohol, that could have had the effects that Ashley experienced and be eliminated from her system in two days. The toxicologist described, for instance, the central-nervous-system depressant GHB, gamma-hydroxybutyric acid, which he said is commonly used in date-rape situations. That drug typically involves more vomiting than other central nervous system depressants and is eliminated from the person's body in nine to twelve hours. The toxicologist explained that, in sufficient doses, and combined with alcohol, benzodiazepines can cause unconsciousness, vomiting, loss of motor-coordination, loss of motor skills, and amnesia.

No seminal fluid was found in the vaginal exam of Ashley at Parkland Hospital, and her vaginal area was not bruised or torn. The doctor who examined her explained that these facts did not rule out a sexual assault because the exam was more than eighteen hours after the alleged assault and Ashley had showered and urinated. The doctor explained that they generally do not find physical evidence of a sexual assault in a

sexually active woman, particularly when the woman was unconscious during the event.

For the defense, one of appellant's doctor friends testified that he remembered appellant coming to his July 4, 2002 pool party with a date.  He testified on cross-examination that appellant has never used the name Rick and is not from Italy.  At the time of appellant's arrest, a police officer called appellant Rick, and appellant defensively stated that he did not "go by that."

Another of appellant's friends, a bartender and part-owner of Zubar, testified that he remembered appellant being at Zubar with a date on July 4, 2002.  He claimed appellant and his date were being so affectionate with each other that he joked they should "get a room."  The Zubar owner testified that the bar had approximately 1,200 patrons per month.  Aside from his memory of appellant's date with the complainant, the owner recalled only two of appellant's other dates: a blond woman and Ashley.  The bills from appellant's dates with both the complainant and Ashley contained orders for drinks that the women claimed they never drank and did not recall appellant drinking.

*Perwani v. State*, No. 05-04-00028-CR at 1-10.

## III.  Discussion

## 1.    Standard of Review

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the

AEDPA), 28 U.S.C. § 2254 provide:

> (d)    An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the

writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the

United States Supreme Court on a question of law or if the state court decides a case differently

from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v.*

*Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal

court may grant a writ of habeas corpus if the state court identifies the correct governing legal

principle from the United States Supreme Court's decisions, but unreasonably applies that

principle to the facts of the prisoner's case. *Id*.

**2.      Limiting Cross-Examination**

Petitioner argues his right to confrontation was denied when the trial court limited his

cross-examination of the complainant. Petitioner states it was disputed at trial whether the

benzodiazepine that was found in the complainant's urine was from the Valium complainant

took on June 29, 2002, or from a drug that Petitioner allegedly administered to her on July 4,

2002. Petitioner states the trial judge prevented his counsel from asking Petitioner whether she

had access to benzodiazepines.

The Confrontation Clause guarantees a defendant's right to cross-examine his accusers.

U.S. CONST. amend. VI. This right is not unlimited, however. *United States v. Jimenez*, 464

F.3d 555, 559 (5th Cir. 2006). A trial court has discretion to apply reasonable limits on a

criminal defendant's "right to cross-examine witnesses based on concerns about, among other

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant." *United States v. Hitt*, 473 F.3d 146, 156 (5th Cir. 2006)

(quotations omitted). To determine whether a defendant's rights have been violated, the court

must determine "whether the jury had sufficient information to appraise the bias and motives of

the witness." *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993). A defense counsel

must be "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and

credibility, could appropriately draw inferences relating to the reliability of the witness." *Hitt*,

473 F.3d at 156.

In this case, the record shows that defense counsel made a bill of exceptions regarding his

proposed questions for cross-examination of the complainant.   The record shows as follows:

| | |
|---|---|
| DEFENSE COUNSEL: | I would ask the witness, if the court permitted me, if she had taken any antianxiety medications from July 4th to July 9th, and I would anticipate her answer would be yes.  And I would ask her if she had prescription bottles in her home that had not been completely emptied that contained antianxiety medications such as Xanax.  I would anticipate her answer would be yes.  Then I would ask her if she told the doctor she went to visit on July 8th, at the time she made her report regarding the incident, that she took Xanax for anxiety.  And I anticipate her answer would be yes. |
| | I would ask the court permission to ask those questions. |

(Trial Tr. Vol. 4 at 151-53.)

Once the jury returned to the courtroom, the court allowed defense counsel to ask

complainant the first question, but did not allow the other questions.  (*Id.*)  The record shows as

follows:

| | |
|---|---|
| DEFENSE COUNSEL: | [Complainant], between July 4th and July 8th, 2002, did you take any medications? |
| COMPLAINANT: | No, sir. |
| DEFENSE COUNSEL: | Did you take any antianxiety medications? |
| COMPLAINANT: | No, sir. |

(*Id.* at 154.)

Defense counsel was therefore allowed to question the complainant regarding whether

she took any antianxiety medication from the date of the incident until the date she provided the

urine sample.  Although Petitioner argues he should have been allowed to ask the complainant whether she had access to any antianxiety medication during this time, that question is not relevant to whether she took any antianxiety medication during those dates.  The court's decision to disallow questions regarding the complainant's access to antianxiety medications did not infringe on Petitioner's ability to expose any facts relating to the complainant's credibility, bias or motives.  This claim should be denied.

**3.      Extraneous Offense**

Petitioner states his due process rights were violated when the court admitted evidence that Petitioner sexually assaulted a second victim, Ashley Olin.  He also argues the evidence was inadmissible under Texas Rule of Evidence 404(b).

To the extent Petitioner alleges a constitutional claim, Respondent argues the claim is procedurally barred.  A federal court will ordinarily not review a claim where a petitioner has not presented his claim to the highest court of the state and the state court to which he would be required to present his claims would now find the claim procedurally barred.  *See Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991).

The record reflects that Petitioner failed to raise this claim in state court.  Accordingly, the Texas Court of Criminal Appeals has not reviewed the claim.  The claim cannot be reviewed by a state court because it is too late to file a petition for discretionary review.  If this Court were to require Petitioner to return to state court to exhaust this claim, it would be subject to dismissal.

To overcome the procedural bar established by the abuse-of-the-writ doctrine, a petitioner must demonstrate: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a

"fundamental miscarriage of justice."  *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997) (citing

*Coleman*, 501 U.S. at 750).  Petitioner has not shown sufficient cause for his failure to present

this claim to the Texas Court of Criminal Appeals.

Petitioner has also failed to demonstrate the need to prevent a miscarriage of justice.

This exception is "confined to cases of actual innocence, 'where the petitioner shows, as a

factual matter, that he did not commit the crime of conviction.'"  *Fairman v. Anderson*, 188 F.3d

635, 644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)).  To establish

the required probability that he was actually innocent, a petitioner must support his allegations

with new, reliable evidence that was not presented at trial and must show it was more likely than

not that no reasonable juror would have convicted him in light of the new evidence.  *Id.* (citing

*Schlup*, 513 U.S. at 327).  Petitioner has presented no new, reliable evidence showing that it was

more likely than not that no reasonable juror would have convicted him.  Accordingly, the

procedural default doctrine bars federal habeas relief on Petitioner's claim that his constitutional

rights were violated when the trial court allowed evidence of the extraneous offense.

To the extent Petitioner argues the trial court violated a Texas rule of evidence, he fails to

state a claim for federal habeas relief.  Federal habeas corpus relief is available only for the

vindication of rights existing under federal law.  *See Manning v. Blackburn*, 786 F.2d 710, 711

(5th Cir. 1986); *see also*, *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995) (finding it is not the

function of federal habeas courts to review the interpretation of state law by a state court).  This

claim should therefore be denied.

**4.      False Testimony**

Petitioner argues his due process rights were violated because the state relied on false and

inaccurate testimony from Ernest Street and Chris Heartsill regarding the excretion rate of benzodiazepine.  Heartsill was a senior toxicologist at Southwestern Institute of Forensic Sciences in Dallas.  He testified that if a person took one Valium pill, he would not expect to see metabolites of the Valium in the urine nine or ten days later.  (Trial Tr. Vol. 5 at 220.)   Street was an employee from Lab Corp.  He testified a single therapeutic dose of Valium would be present in the urine about seven days.  (*Id.* at 61.)  Petitioner argues both that the prosecutor was aware he was relying on false testimony, and that even if the prosecutor was not aware of the false testimony, the testimony violated his due process rights.

The Supreme Court has determined that a defendant's due process rights are violated when the government knowingly uses perjured testimony to obtain a conviction.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also*, *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998) ("A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.  The defendant must show that (1) the testimony was false, (2) the state knew it was false, and (3) the testimony was material.").  The Fifth Circuit, however, has determined that Supreme Court precedent has not held that the government's unknowing use of perjured testimony violates the Due Process Clause.  *Kinsel v. Cain*, 647 F.3d 265,271-72 (5th Cir.2011).  To the extent Petitioner argues the prosecutor unknowingly used perjured testimony, his due process claim fails.

The record shows Ernest Street testified that complainant's July 8, 2002, urine sample showed three metabolites of benzodiazepine.  The complainant testified she took a Valium on June 29, 2002.  She stated she took no other antianxiety drugs from July 4th to the time she provided a urine sample on July 8, 2002. There was a dispute at trial as to whether the

benzodiazepine found in the complainant's urine was from the Valium she took on June 29, 2002, or was from a drug the Petitioner allegedly slipped into her drink on July 4, 2002.

Petitioner states Street falsely testified that a therapeutic dose of Valium would "absolutely be excreted in a four day period."  (Pet. Oct. 4, 2010 Mem. at 119).  Petitioner also claims Street testified falsely "that all established research supported [this] opinion." (*Id*.)  It appears Petitioner is referring to the following testimony:

| | |
|---|---|
| PROSECUTOR: | If it was ingested late evening July 4th, the urine is taken the following July 8th, would you expect there to be some indication in the urine that the benzodiazepine is still present? |
| STREET: | Yes, absolutely. |
| * * * | |
| PROSECUTOR: | Okay.  And why would you expect it to be present if it was ingested late evening July 4th?  If urine's taken July 8th, why would you expect the benzodiazepine to be there when it wasn't on June 29th? |
| STREET: | Well, if you look at even the outside of the half-life of the drugs temazepam and nordiazepam, it would not even fall within the range established in all the research, given that all the drug would have been excreted in a four-day period. |

(Trial Tr. Vol. 5 at 64-65.)

Street makes reference to the half-life of temazepam and nordiazepam.  Street testified that the half-life is measured in the blood, rather than the urine, and that benzodiazepine would dissipate from the blood more quickly than from urine.  (*Id*. at 57.)  It is unclear what Street meant by "given that all the drug would have been excreted in a four-day period."  Street was testifying that he would still expect to see benzodiazepine in the urine four days after it was ingested.  Additionally, Street made repeated statements on direct and cross-exam stating that a

single therapeutic dose of Valium could remain in the urine longer than four days.  Street

testified as follows:

> PROSECUTOR:      How long a period of time – if someone ingests a benzodiazepine, how long a period of time will it be present in a person's urine?
>
> STREET:          It –
>
> PROSECUTOR:      And what are the factors that determine how long you can detect it?
>
> STREET:          Okay.  It varies widely.  There's a wide variation in response to any given drug among large populations of individuals.  If you're familiar with the bell-curve distribution of galcion (phonetically spelled) distribution, there's approximately 98 percent of the population respond in a highly predictable fashion.  At one end there are individuals who will not respond at all.  The other end there are individuals who have what we call an idiosyncratic reaction to the drug; the effect is much greater than anticipated.
>
> By and large, the benzodiazepine on a single dose will stay around no longer than about seven days.  With chronic ingestion, that is on a daily basis, they will stay around for another two or three days, maximum.

(*Id*. at 61.)  Further, on cross-examination, Street testified that if a benzodiazepine was ingested

on July 2, 2002, it could still be detected on July 8, 2002 – more than four days after ingestion.

(*Id*. at 74.)

Petitioner also claims that:  "Street testified the presence of benzodiazepine in

Complainant's urine could only be ascribed to her unknowing dosing on July 4th, 2002, while she

was in the company of Perwani.  RR 64, 86."  (Pet. Oct. 4, 2010 Mem. at 111-112.)  This

statement mischaracterizes the record in this case.  Street testified it was impossible to say

whether the complainant took a benzodiazepine on July 4th, 2002.  The record shows as follows:

> DEFENSE COUNSEL:      Now, what degree of medical certainty can you assign to the proposition that the benzodiazepine that you found had

|  |  |
|---|---|
|  | to be consumed on July 4th? |
| STREET: | No, there's nothing here that would give me any degree of certainty. |
| DEFENSE COUNSEL: | Right.  1-in10 chance? |
| STREET: | Yeah. |
| DEFENSE COUNSEL: | Or, just impossible to say? |
| STREET: | That's correct. |

(Trial Tr. Vol. 5 at 90.)

Street further testified the complainant's lab results could be the result of multiple

scenarios:

|  |  |
|---|---|
| DEFENSE COUNSEL: | These results are consistent with somebody getting drunk on July 4th and then prior to July 8th ingesting a benzodiazepine? |
| STREET: | Yes. |
| DEFENSE COUNSEL: | These results are consistent with somebody taking a benzodiazepine such as Valium on a fairly regular basis prior to July 4th and consuming alcohol? |
| STREET: | Yes. |
| DEFENSE COUNSEL: | These results are consistent with somebody ingesting a benzodiazepine or antianxiety medication such as Valium a day or two before the test? |
| STREET: | Yes. |

(*Id*. at 86.)

In an attempt to show that Street's and Heartsill's testimony was false, Petitioner submits

an affidavit from Dr. Ashraf Mozayani stating that one study found that a single dose of

diazepam could be detectable in urine up to nine days.  (*Ex parte Perwani* at 163.)  Dr.

Mozayani also disputes whether alcohol would enhance the effect of benzodiazepine and she states Street is not qualified to testify on the excretion rate of benzodiazepine.  (*Id*. at 71-78.) Petitioner also submitted form affidavits from three experts stating research has shown that a single diazepam could be detectable up to nine days.  (*Id*. at 140, 144, 151.)

Petitioner's evidence fails to show the prosecutor knew or should have known that Street and/or Heartsill testified falsely – or that they testified falsely at all.  The state court determined the competing affidavits and testimony showed a battle of the experts rather than false testimony. (*Ex parte Perwani* at 139.)

Further, to show a due process violation, the testimony must be material.  In this case, the state was not required to show that Petitioner drugged the complainant.  The state was required show the complainant did not consent to the sexual encounter.  The complainant testified she was incapacitated during the sexual encounter and that she did not consent.  (Trial Tr. Vol. 4 at 58-68.)  Petitioner has failed to show the state court's denial of this claim was unreasonable.

**5.**     **Voir Dire**

Petitioner argues due process rights were violated when his counsel referred to him as "Middle Eastern" during voir dire.  Petitioner states this statement was prejudicial and infected the panel with bias against him.  (Pet. Oct. 4, 2010 Mem 104).  Petitioner also states he is not Middle Eastern but is of Indian descent.

On state habeas review, defense counsel stated that he was aware that Petitioner was Indian or Pakistani.  (*Ex parte Perwani* at 143.)  Defense counsel stated the trial was shortly after 9-11 and he believe he would be negligent if he did not ask the venire panel about any bias regarding the Middle East.  (*Id*. at 142.)

Defense counsel asked the venire panel whether any of them would be biased against Petitioner because of his Middle Eastern descent.  (Trial Tr. Vol. 3 at 92.)  No one expressed any bias or problem.  Later in voir dire, defense counsel asked whether anyone could not be fair or impartial.  Panel member Ms. Huckeba stated she could not be fair because Petitioner was Middle Eastern and "the value of women is not great in the Middle East."  (*Id*. at 103.)

On state habeas review, the court determined that Ms. Huckeba "did not serve on Applicant's jury," and that Petitioner "has not shown that any juror who actually served on the jury was adversely influenced by [Huckeba's] remark."  (*Ex parte Perwani* at 140.)  Petitioner has not shown the state court's decision to deny relief on this claim was unreasonable.

## 6.    Ineffective Assistance of Counsel

Petitioner claims he received ineffective assistance of trial and appellate counsel.  To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.  Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*.

Even if counsel is proven deficient, a petitioner must prove prejudice.  To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694).  "[T]he mere possibility of a

different outcome is not sufficient to prevail on the prejudice prong." *Id.* "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

**A.    Trial Counsel**

**(1)    Limiting Instruction**

Petitioner argues his counsel was ineffective because counsel failed to immediately request a limiting instruction upon the admission of extraneous offense evidence.  (Pet. Oct. 4, 2010 Mem. at 31.)  Petitioner argues counsel should have requested a limiting instruction immediately after Ashley Olin testified that Petitioner also sexually assaulted her.

At trial, outside the jury's presence, the court ruled that Olin's testimony was admissible under Texas Rule of Evidence 404(b) for the purpose of showing modus operandi and intent. Defense counsel objected to the admissibility of this testimony, but did not request a limiting instruction.  (Trial Tr. Vol. 4 at 202-251; Vol. 5 at 94-95.)  On state habeas review, defense counsel stated it was an oversight not to request the limiting instruction.  (Habeas Hrg. Vol. 3 at 69.)

The record shows, however, that the jury charge included the limiting instruction.  The charged stated:

> [Y]ou cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other bad acts, if any were committed, and even then you may only consider the same in determining the intent, motive, plan, or preparation of the defendant or absence of consent on the part of the complainant, if any, alleged against him in the indictment in this case, and for no other purpose."

(Clerk's Record at 92.)   Additionally, the prosecutor in his closing explained that Olin's testimony was limited to considering Petitioner's "knowledge of no consent that night, his intent,

common scheme or plan, absence of mistake." (Trial Tr. Vol. 6 at 93-94.)

Although it may have been preferable for defense counsel to have requested the limiting instruction at the time the testimony was admitted, because the jury was properly charged regarding the limitation on Olin's testimony, Petitioner has failed to show the state court's denial of this claim was unreasonable.

### (2) Referring to complainant as "victim"

Petitioner argues his counsel was ineffective because he failed to the object to the prosecutor referring to the complainant as the "victim." The cases cited by Petitioner to support this claim find that it is improper for the *court* to refer to the complainant as the "victim." They do not address the prosecutor's use of the term "victim." Defense counsel stated on state habeas review that it is his strategy not to lodge objections for every objectionable statement. (*Ex parte Perwani* at 66-67.) Further, to extent the prosecutor referred to the complainant as "victim" during arguments, Texas law allows the prosecutor to make arguments based upon a reasonable deduction from the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The Court finds Petitioner has failed to show that his counsel was constitutionally ineffective for failing to make this objection.

### (3) Voir Dire

Petitioner argues his counsel was ineffective because he referred to Petitioner as Middle Eastern during voir dire. As discussed above, defense counsel stated he asked the venire panel whether anyone could not be fair to Petitioner because Petitioner was Middle Eastern. One venire member, Ms. Huckeba, answered that she could not be fair and she was not selected for the jury. Defense counsel was not deficient for exploring the venire panel's possible prejudices

against Petitioner.  Petitioner's claim should be denied.

**(4)    Toxicology Expert**

Petitioner argues his counsel was ineffective because he did not retain a toxicology expert to challenge the state's theory that Petitioner drugged the complainant.  Petitioner again argues that: "[T]he State presented expert testimony that alleged all research indicated that benzodiazepines are excreted in a four (4) day period," and "Street testified that the Complainant's positive urine sample on July 8, 2002, could only be explained by the ingestion of a surreptitious dosing on July 4, 2002, while on a date with Perwani."  (Pet. Oct. 4, 2010 Mem. at 53, 55.)  As discussed above, the record does not support Petitioner's claims regarding Street's testimony.

Petitioner also states Street testified that the benzodiazepine found in the complainant's urine "was not consistent with Valium."  (Pet. Oct. 4, 2010 Mem. at 55.)  Street actually testified, however, that the July 8, 2002 urine results were not consistent with the complainant having taken a Valium *on June 29, 2002.*  (Trial Tr. Vol. 5 at 86.)  Street testified the results could be consistent with someone taking a Valium closer to the date of the July 8, 2002, urine sample, or someone who is a chronic user of Valium.  (*Id.*)

As discussed above, Petitioner submitted affidavits from experts stating that a single dose of diazepam could be detected for nine days.  Street differed only in that he believed the results of a single dose would be present only "about seven days."  Petitioner has failed to show that had his counsel called his experts at trial, there is a reasonable probability that the result of his trial would have been different.  This is especially true since the prosecutor was not required to show that the complainant had been drugged to prove the elements of sexual assault.  This claim

should be denied.

###### (5)   Cumulative Prejudice

Petitioner argues the cumulative effect of trial counsel's errors resulted in effective

assistance of counsel.  As discussed above, however, Petitioner's individual claims are without

merit.  His claim of cumulative prejudice should therefore be denied.

### B.   Appellate Counsel

###### (1)   Extraneous Offense

Petitioner argues appellate counsel was ineffective because he failed to argue that the

state failed to prove the extraneous offense beyond a reasonable doubt.  He claims the state

failed to prove that Petitioner drugged or sexually assaulted Olin.

The jury was not required to find the extraneous offense was proved beyond a reasonable

doubt to convict Petitioner of sexually assaulting the complainant.  There is no way to know if

they jury considered Olin's testimony in reaching their verdict.  The jury could have disregarded

Olin's testimony and still convicted Petitioner.  Petitioner has failed to show his counsel was

ineffective for failing to raise this claim.

###### (2)   Improper Argument

Petitioner argues appellate counsel was ineffective because he failed to argue the trial

court improperly overruled his objection to the state's argument that it did not have to prove the

extraneous offense beyond a reasonable doubt.

Petitioner complains of the following closing arguments by the prosecutor:

Can we prove this man put his penis insider her [Ashley Olin's] vagina?  No.  We don't
have to do that.  You don't consider that for any purposes, ladies and gentlemen, other
than a bad act to show this defendant's intent with respect to Claire Middleton, a
common scheme or plan with respect to Claire Middleton.  That's the purpose of Ashley

Olin's testimony, ladies and gentlemen.  You don't go back and decide whether or not he committed an act of sexual intercourse with Ashley Olin, although certain (sic) you can infer that.

(Trial Tr. Vol. 6 at 123-24.)

The state habeas court determined the prosecutor correctly stated the state did not have to prove penetration beyond a reasonable doubt for the jury to consider Olin's testimony regarding the assault.  (*Ex parte Perwani* at 60.)  Texas Rule of Evidence 404(b) allows evidence not just of crimes, but other "wrongs or acts."  The state therefore did not have to prove penetration, or sexual assault as defined in the Texas Penal Code, for the jury to consider Olin's testimony.  This claim should be denied.

### (3)      Improper Closing

Petitioner argues appellate counsel was ineffective because he failed to argue that the trial court erred in overruling Petitioner's objection to the state's closing argument.  Petitioner complains about the following closing argument by the prosecutor:

Let's address right now the matter the defense attorney was just discussing.  The state brought to you ladies and gentlemen everything that we legally could bring to you in this trial.

(Trial Tr. Vol. 6 at 110).  Defense counsel objected that the prosecutor was asking the jurors to speculate on evidence not presented at trial.  The trial court overruled the objection.

On state habeas review, the court determined the prosecutor was properly responding to defense counsel's closing argument wherein he stated:

You heard the evidence of the search.  You heard that his apartment was searched.  You have seen what was brought to you from that search.  There are no drugs, ladies and gentlemen.

(*Ex parte Perwani* at 59.)

Drugs were found at Petitioner's apartment, but none of those drugs contained benzodiazepine or any "date-rape" drug.  (Trial Tr. Vol. 4 at 26-34.)  The trial court therefore did not allow this drug evidence to be presented to the jury.  (*Id.* at 34.).  The prosecutor was properly allowed to rebut defense counsel's claim that no drugs were found in Petitioner's apartment.  *Wesbrook*, 29 S.W.3d at 115 (finding prosecutor's "answer to argument of opposing counsel" is proper).  Petitioner has failed to show his counsel was constitutionally deficient for failing to raise this claim.

### (4)    Cumulative Error

Petitioner argues the cumulative effect of appellate counsel's errors resulted in effective assistance of counsel.  As discussed above, however, Petitioner's individual claims are without merit.  His claim of cumulative prejudice should therefore be denied.

## 7.    Summary

Petitioner is lawfully restrained because he has failed to prove that he has been denied a constitutionally protected interest.  Accordingly, the state courts' determination to deny relief is not contrary to or does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**RECOMMENDATION**

This Court recommends that the petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 be DENIED.

Signed this 28th day of February, 2012.


_____

**PAUL D. STICKNEY**
**UNITED STATES MAGISTRATE JUDGE**

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).